**Slip Op. 12 - 99**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| MACLEAN-FOGG COMPANY, *et. al.*,<br>Plaintiffs,<br>v.<br>UNITED STATES,<br>Defendant. | Before: Donald C. Pogue, Chief Judge<br><br>Consol.[1] Court No. 11-00209 |

OPINION AND ORDER

[Commerce's remand determination is REMANDED.]

Dated: July 30, 2012

Thomas M. Keating, Lisa M. Hammond, and Kazumune V. Kano, Hodes Keating & Pilon, of Chicago, IL, for Plaintiffs MacLean-Fogg Co. and Fiskars Brand, Inc.

Mark B. Lehnardt, Lehnardt & Lehnardt LLC, of Liberty, MO, for Plaintiff-Intervenors Eagle Metal Distributors, Inc. and Ningbo Yili Import & Export Co., Ltd.

Craig A. Lewis, T. Clark Weymouth, and Brian S. Janovitz, Hogan Lovells US LLP, of Washington, DC, for Plaintiff-Intervenor Evergreen Solar, Inc.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the briefs was Joanna Theiss, Attorney, Office of the Chief Counsel for the Import Trade Administration, U.S. Department of Commerce, of Washington, DC.

Stephen A. Jones, Christopher T. Cloutier, Daniel L. Schneiderman, Gilbert B. Kaplan, Joshua M. Snead, and Patrick J.

---

[1] This action is consolidated with Court Nos. 11-00210, 11-00220, and 11-00221.

Togni, King & Spalding LLP, of Washington, DC, for Defendant-Intervenor Aluminum Extrusions Fair Trade Committee.

**Pogue, Chief Judge:** This case returns to the court following remand in MacLean-Fogg Co. v. United States, 36 CIT __, 836 F. Supp. 2d 1367 (2012) ("MacLean-Fogg I"). In MacLean-Fogg I, and again upon Plaintiffs' motion for reconsideration in MacLean-Fogg Co. v. United States, 36 CIT __, Slip. Op. 12-81 (June 13, 2012) ("MacLean-Fogg II"), the court found that the Department of Commerce's ("the Department" or "Commerce") calculation of the all-others 374.15% countervailing duty ("CVD") rate[2], based solely on mandatory respondents' adverse facts available ("AFA") rate, while legally permissible, was neither reasonable in this instance or based on a reasonable reading of the record. MacLean-Fogg I, 36 CIT at __, 836 F. Supp. 2d at 1375-76. The court ordered Commerce to either explain how its conclusion is reasonable or, alternatively, recalculate the all-others rate. Id. On remand, Commerce continues to base the all-others rate solely on the mandatory respondents' AFA rate, explaining that this is reasonable because the mandatory

[2] Aluminum Extrustions from the People's Republic of China, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (final affirmative countervailing duty determination) ("Final Determination") and accompanying Issues & Decision Memorandum, C-570-968, ARP 09 (Mar. 28, 2011), Admin. R. Pub. Doc. 385 available at http://ia.ita.doc.gov/frn/summary/PRC/2011-7926-1.pdf (last visited July 24, 2012) ("I & D Mem.") (adopted in Final Determination, 76 Fed. Reg. at 18,522).

respondents represent a significant portion of the market and are therefore representative of the all-others companies. Final Results of Remand Redetermination, ECF No. 62-1, at 1 ("Remand Results"). Plaintiffs, who are some of the all-others companies to whom the rate applies, again seek review of this rate.

Because Commerce failed to explain how the assumption that Respondents used 100% of the subsidies available throughout the entire People's Republic of China ("PRC") is remedial not punitive – providing no more than an appropriate level of deterrence – the court again remands the rate to Commerce.

This court has jurisdiction pursuant to Section 516(a)(2)(B)(I) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516(a)(2)(B)(I) (2006) and 28 U.S.C. § 1581(c).[3]

**BACKGROUND**[4]

In its investigation of Chinese producers and exporters of aluminum extrusions, Commerce designated the three largest exporters as mandatory respondents.[5] These mandatory respondents

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

[4] Familiarity with the court's prior opinions is presumed.

[5] The merchandise covered by the investigation are aluminum shapes and forms created by the extrusion process and made from aluminum alloys which correspond to the Aluminum Association designations beginning with the numbers 1, 3, or 6. Final (continued...)

failed to respond to Commerce's questionnaire. MacLean-Fogg I, 36 CIT at __, 836 F. Supp. 2d at 1370. Because the mandatory respondents failed to cooperate, Commerce relied on facts available when calculating the mandatory respondents' CVD rates. 19 U.S.C. § 1677m. Using information provided by the domestic industry, Commerce listed 59 subsidy programs that the importer producers could have availed themselves of and calculated an AFA CVD rate using the highest possible subsidization rate for each of these 59 programs. I&D Memo at Comment 8, 67.[6] The resulting

---

[5](...continued)
Determination, 76 Fed. Reg. at 18,521. These forms are produced in a variety of shapes, ranging from solid to hollow profiles in pipes, tubes, bars, and rods. They may also be prepared for assembly by being cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun. Id.

When an investigation involves a large number of respondents, the statute allows Commerce to narrow its focus to a reasonable number of exporters or producers. See 19 U.S.C. § 1677f-1(e)(2). These are mandatory respondents. In contrast, voluntary respondents are producers or exporters not initially selected for individual examination, but who nonetheless submit information for examination. See 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d). Consequently, the aptly named "all-others" rate refers to all other respondents that do not fall under either of these two categories. See 19 U.S.C. § 1671d(c)(1)(B)(i)(I).

[6] Commerce made two changes between the Preliminary and Final determinations which more than doubled the CVD rate. Plaintiffs' Comments on Remand Results at 16, (July 13, 2012), ECF No. 69 ("Pls.' Comments"). It added 23 new subsidy programs and raised the assumed subsidy rate on 29 of the total programs by approximately 2%. Final Determination, 76 Fed. Reg. 18,521; I&D Memo at Comment 7, 63-66. In doing so, Commerce stated that nothing on the record suggested that these subsidy programs were
(continued...)

AFA rate for the mandatory respondents was 374.15%. MacLean-Fogg I, 36 CIT at __, 836 F. Supp. 2d at 1371. By contrast, two companies that were selected as voluntary respondents received much lower individual rates of 8.02% and 9.94% respectively. Id.

When calculating the "all-others" rate for the remaining companies, Commerce excluded the voluntary respondents' rates from its calculations in accordance with its regulation, 19 C.F.R. § 351.204(d)(3). MacLean-Fogg I, 36 CIT at __, 836 F. Supp. 2d at 1371. Commerce instead averaged the mandatory respondents' rate, resulting in an all-others rate identical to the AFA rate. Id. In MacLean-Fogg I, Plaintiffs challenged the regulation, the use of AFA rate in the calculation of the all-others rate, and the exclusion of the voluntary respondents' rate, contending that the governing statute, 19 U.S.C. § 1671d(c)(5)(A)(i)-(ii), unambiguously required Commerce to use the rates of all individually investigated respondents when calculating the all-others rate. Id. at 1372-73. This court concluded in MacLean-Fogg I that this statute was ambiguous, allows the use of facts available in a reasonable manner, and permits Commerce to use mandatory respondents' AFA rates in the

[6](...continued)
not available to non-cooperative parties and reasoned that including all of these programs would prevent non-cooperating respondents from avoiding newly discovered subsidy programs. I&D Memo at Comment 8, 67.

calculation of the all-others rate without a finding of non-cooperation. Id. at 1374 n. 9. Therefore Commerce's regulation and methodology were reasonable. However, the court found that Commerce's methodology was not supported by substantial evidence because it failed to articulate a logical connection for attributing the high mandatory respondents' rate to the all-other companies, and failed to address whether the rate was remedial rather than punitive. Id. at 1375-76.

On remand, Commerce chose to use the same methodology and provided additional explanation for its decision. Remand Results at 1. In addition to reiterating its earlier concerns with rate manipulation, Commerce further explained that the mandatory respondents' exports represent a significant portion of the sales of subject merchandise. Id. at 4-7. By comparison, the voluntary respondents make up a tiny fraction of that market. Id. at 6-7. In light of these significant differences in market share, the Department stated that its continued exclusive use of only the mandatory respondents' rate in the calculation of the all-others rate is a reasonable and reliable reading of record evidence because such a large portion of the market is highly representative of the entire market as a whole. Id. at 8. Commerce considered voluntary respondents' share of the industry too low to be probative of the industry's level of subsidization or to validly challenge the representativeness of mandatory

respondents' rate. Id. at 7. Moreover, to include the voluntary respondents' rates would have run contrary to the policy reasons underpinning Commerce's regulation — namely, a fear of manipulation of the all-others rate and a desire to maintain its integrity from potential distortions. Id. at 4-5; see also Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,310 (Dep't Commerce May 19, 1997). Specifically, Commerce stated that voluntary respondents are more likely self-selected because they know that their CVD rates will be lower. Remand Results at 5. As such, their rates could potentially distort the representativeness of the all-others rate, especially here where such a significant segment of the industry failed to participate, as opposed to the small percentage of the industry that did. Id. The Department further stated that it would have relied on the mandatory respondents' rates regardless of whether they were lower or higher than the voluntary respondents' rates.[7] Id.

---

[7] Indeed, Commerce noted it has previously departed from the mandates of its regulation to include voluntary respondents' rates in its calculations where appropriate. Id. at 11 (quoting Laminated Woven Sacks from the People's Republic of China, 73 Fed. Reg. 35,639 (Dep't. Commerce June 24, 2008) (final affirmative countervailing duty determination and final affirmative determination, in part, of critical circumstances) ("Laminated Woven Sacks"). Commerce considered using the weighted averages of both mandatory and voluntary respondents, but ultimately rejected this approach because it neither complied with its regulation nor mitigated its concern that the inclusion of voluntary respondents could lead to manipulation of the all-others rate. Remand Results at 12.

at 7. Having chosen the mandatory respondents as representatives of the market, Commerce considered it "inappropriate to ignore the fact that [AFA] . . . had to be applied to all mandatory company respondents" and thus used the mandatory respondent rates even though they were based on AFA. Id. at 8-9 (quoting Laminated Woven Sacks, 73 Fed. Reg. at 35,639. Plaintiffs again challenge this rate.

**STANDARD OF REVIEW**

"The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, 33 CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(1)).

**DISCUSSION**

Plaintiffs assert again that Commerce unreasonably excluded the voluntary respondents' rates when calculating the all-others rate and unlawfully applied AFA to the all-others companies. However, they also concede that the court has already recognized that this methodology, which averages the rates of mandatory respondents, even where those rates are all based on AFA, is specifically permitted by the statute. Pls.' Comments at

4; MacLean-Fogg I, 36 CIT at __, 836 F. Supp. 2d at 1374-1375. Furthermore, the court has already approved the decision not to include in that average the rates of the voluntary respondents. Id.

Nonetheless, as we concluded in Maclean-Fogg I, the chosen rate must be based on a reasonable reading of the record evidence. Id. at 1376. Specifically, it must be based on reliable evidence in the record and must be relevant to the all-others respondents. See Dongguan Sunrise Furniture Co. v. United States, 36 CIT __, Slip Op. 12-79, at *8 (June 6, 2012) ("Commerce must provide some justification for finding that . . . [this] rate . . . is relevant and reliable for this respondent in this time period."). Commerce's responsibility is to choose "a rate that, on this record, could reasonably be accepted as an approximation of [][the all-others companies'] rate, albeit with a built in increase intended as a deterrent to non-compliance." KYD, Inc. v. United States, 36 CIT __, 807 F. Supp. 2d 1372, 1378 (2012). This comports with the SAA requirement that the rate be "reasonably reflective of potential [CVD] margins for non-investigated exporters or producers." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N.4040, 4201 ("SAA").

Here, Commerce defends its choice of mandatory

respondents' rates based on its finding that the mandatory respondents' goods represent a significant portion of imports of the subject merchandise. Remand Results at 6-7. Because the mandatory respondents were responsible for a large volume of the subject merchandise, Commerce found that they are more representative of all producers and exporters as opposed to the smaller, self-selected sample of voluntary respondents.[8] Commerce points out that using the mandatory respondents' rates allows it to obtain information for a substantial majority of the market. Id. at 10. Finally, Commerce notes that it considered other methods of incorporating the voluntary respondents' rate into the all-others rate, but ultimately rejected them due to overwhelming concerns about rate manipulation given the specific facts in this case, namely the striking difference in import volume between the mandatory and voluntary respondents.[9] Id. at 10-12. Under these circumstances, Commerce shows it considered the issue carefully and reasonably decided not to give weight to

---

[8] Commerce further noted that with one lone exception, its practice in AD and CVD investigations has never been to limit respondents by statistical sampling, as the statute permits. Remand Results at 8. Rather, it has always selected respondents based on volume. Id.

[9] Commerce considered using the approach in Laminated Woven Sacks, where they averaged all rates determined to obtain an all-others rate, and it also considered using a weighted average of the mandatory and voluntary respondents' rates. Remand Results at 10-12.

the voluntary respondents' rates.

Plaintiffs continue to attack the use of the mandatory respondents' total AFA rate as not a "reasonable method" per se, but this issue is resolved by the statute. Nothing in the statute requires that the mandatory respondents' rates, even when based on AFA, may only be used to develop rates for uncooperative respondents. Federal Circuit precedent is not to the contrary. Rather, these cases set the parameters summarized in Dongguan and KYD above. See, e.g., PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009); Dongguan, 36 CIT at __, Slip Op. 12-79 at *8 (summarizing and citing Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1323-24 (Fed. Cir. 2010), and F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Moreover, as Plaintiffs concede, "if mandatory respondents do not cooperate in a countervailing duty investigation, Commerce has no product- or industry-specific information establishing use or rates for individual subsidy programs alleged to have been used." Pls.' Comments at 13. Thus Commerce must necessarily base its rate determination on secondary data that simply cannot be a direct representation of the all-others companies' subsidy experience. Accordingly, Plaintiffs' argument that the rate chosen is based on program-specific CVD rates that include programs from investigations of

different products from different industries does not render that rate unreasonable. See PAM, 582 F.3d at 1340 ("So long as the data is corroborated, Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference.").

As Commerce explained, its total-AFA rate methodology in this case necessarily involved program-specific CVD rates calculated for different programs in investigations of different products from different industries:

> [F]or purposes of deriving the AFA rate for the three noncooperating mandatory respondents, we are using the highest non-de minimis rate calculated for the same or similar program (based on treatment of the benefit) in another PRC CVD investigation. Absent an above-de minimis subsidy rate calculated for the same or similar program, we are applying the highest calculated subsidy rate for any program otherwise listed that could conceivably be used by the non-cooperating companies.

Aluminum Extrusions From the People's Republic of China, 75 Fed. Reg. 54,302, 54,305 (Dep't Commerce Sept. 7, 2010) (preliminary affirmative countervailing duty determination) ("Prelim. Determination"). Commerce further explains that when dealing with non-cooperating companies, it is agency practice to "select, as AFA, the highest calculated rate in any segment of the proceeding." Id.

Importantly, however, Plaintiffs point out that Commerce assumes use, by all respondents, of 100% of subsidy programs alleged by the petitioning U.S. industry when no

respondent in any PRC CVD investigation — including in the underlying investigation — has ever been found to use more than about half such alleged programs. See Pls.' Comments at 16-18. Plaintiffs note that "out of 39 total cooperating respondents in the 26 China CVD investigations completed to date, the most alleged subsidy programs any cooperative respondent has been found to use is only about half." Pls.' Comments at 17. Plaintiffs have attached a survey of CVD investigations from the PRC sorted by percentage of subsidy programs actually used, and it appears that within these programs listed, respondents use approximately 15%-30% of the subsidy programs that Commerce uses in its calculations. Pls.' Comments at Attachment 3. Thus Plaintiffs claim that Commerce's reliance on 100% of the potential subsidies generate an all-others CVD rate not reasonably related to the all-others companies actual experience.[10] Pls.' Comments at 17; De Cecco, 216 F.3d at 1032 ("Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin.").

---

[10] Commerce claims that the Plaintiffs did not demonstrate on the record of this proceeding that any of the alleged subsidy programs were unused, but this argument is unavailing because the information was readily available to Commerce as it appeared in Commerce's published decisions. See Pls.' Comments at Attachment 3 (listing decisions and their corresponding Federal Register citation).

It is Commerce's role to weigh the evidence. Nucor Corp. v. United States, 32 CIT 1380, 1414, 594 F. Supp. 2d 1320, 1356 (2008) ("It is well-established that it is an agency's domain to weigh the evidence"). Nonetheless, here Commerce has calculated a deterrent for the mandatory respondents which is based on 100% use of all alleged subsidies. Remand Results at 26, 33-34. While this could be a reasonable choice for non-cooperating companies, Commerce has not placed an explanation on the record why a rate that is based on fewer than "any program otherwise listed that could conceivably be used by the non-cooperating companies," Prelim. Determination, 75 Fed. Reg. at 54,305, would not be sufficient to provide a rate relevant to the all-others companies. See Dongguan, 36 CIT __, Slip Op. 12-79, at *8. For example, Commerce does not explain why the preliminary 137.65% rate, based on the assumed use of 29 programs, rather than the 54 programs included in the Final Determination, would not have been sufficient to provide an appropriate deterrent. See Remand Results at 26.

Commerce did not find that the Plaintiffs, the all-others companies, were non-cooperative. Notably, Commerce acknowledged in the I&D Memo that, at the Petitioners' urging, it was departing from the practice of attributing subsidies according to the specific province in which mandatory respondents were located. I&D Memo at Comment 8. Rather, Commerce decided

in this investigation to apply every single subsidy program available throughout the PRC to the respondents, regardless of their actual location, based on the assumption that "the same types of subsidy programs exist across most provinces and municipalities." Id. The all-others companies are not the largest companies in this investigation and Commerce has neither explained 1) how smaller companies, which presumably are located in one province or town, can avail themselves of subsidies that exist in another province or town, nor 2) how the assumption that "the same types of subsidy programs exist across most provinces and municipalities" is a reasonable one for the all-others companies. Thus, Commerce has not explained, based on the evidence in the record, how the all-others rate calculated is not punitive rather than remedial.

Accordingly, we remand for Commerce's consideration of this issue.[11]

**CONCLUSION**

For the forgoing reasons, Commerce's calculations are

---

[11] The court has considered all other arguments that the Plaintiffs have put forth and found them to be unavailing. In addition, because the court is remanding the CVD rate for reconsideration, the issue of Plaintiffs' request for review of the preliminary rate is not yet ripe. See MacLean-Fogg II, 36 CIT at __, Slip Op 12-81, at *1-3. The court will address the matter once a reasonable final CVD rate has been determined.

REMANDED.

Commerce shall have until August 30, 2012 to complete and file its Remand Results. Plaintiffs and Defendant-Intervenor shall have until September 13, 2012 to file comments. Plaintiffs, Defendant, and Defendant-Intervenor shall have until September 27, 2012 to file any reply.

It is **SO ORDERED**.

/s/ Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated: July 30, 2012
New York, New York